# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5473 | **DATE** | 11/29/2001 |
| **CASE TITLE** | Hampton vs. Leibach | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Blair Leibach is substituted as respondent for Donald Snyder pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases. The Court grants Hampton's petition for a writ of habeas corpus. Respondent is directed to release Hampton from custody unless, within 30 days from the date of this order, the State of Illinois announces its intention to retry Hampton.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | | |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | NOV 3 0 2001 | | |
| | Notified counsel by telephone. | | | date docketed | | 43 |
| ✓ | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| OR | courtroom deputy's initials | | | | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PATRICK HAMPTON,          )
                                     )
          Petitioner,      )
                                     )
                                     )
     v.                     )     Case No.  99 C 5473
                                     )
                                     )
BLAIR LEIBACH[1]           )
                                     )
          Respondent.    )

DOCKETED

NOV 3 0 2001

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

    In October 1982, Patrick Hampton was convicted in state court of deviate sexual assault, attempted rape, robbery, and aggravated battery, and he received an "extended-term" sixty year sentence. Because of the unusually long period it took Hampton's case to progress through the state courts on direct and collateral review, he has already served nearly twenty years in prison, including the time he spent in custody awaiting trial. In August 1999, Hampton petitioned this Court for a writ of habeas corpus, claiming that he received constitutionally ineffective assistance of counsel at trial and that his sentence violates the principle announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Court agrees with Hampton that his trial counsel failed to render effective assistance and that the state courts' rejection of his claim was unreasonable. The

---

    [1] Blair Leibach is substituted as respondent for Donald N. Snyder pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases.

1

Court therefore grants the writ.

## Proceedings in state court

At a rhythm and blues concert held at Chicago's International Amphitheatre in December 1981, three young Latinos – two women and a man – were attacked in an area in front of the stage by a large group of young African-American men. The Latinos were beaten and robbed, and the women were brutally sexually assaulted. Security guards were initially overwhelmed by the riot but eventually rescued the victims. No one was detained at the scene, and the victims did not provide the police with any descriptions other than that their assailants were black males.

The next day, Keith Powell, a fourteen year old African-American youth, contacted the police. He reported that he had been at the concert and had seen a number of former acquaintances from the Robert Taylor Homes among a large group that marched toward the stage just before the attack, chanting gang slogans and making gang signs. Powell identified Hampton as one of the members of the group, though he did not identify Hampton as having participated in the attack on the three Latinos. Hampton, who was eighteen years old and had no prior criminal record, was arrested along with eight others in the ensuing days.

Most of the defendants pled guilty and received sentences of probation. Hampton and two others, Ronald Mallory and Ricky Knight, went to trial. Jack Rodgon was Hampton's retained counsel. The attorney-client relationship proved troublesome prior to trial. In July 1982, Rodgon attempted to withdraw from the case, citing lack of payment of his attorney's fees. The trial judge denied this request, but offered to appoint Rodgon to represent Hampton. Rodgon resisted, saying "I would rather not even be appointed on this case, because it is [sic] some problems." Tr. 129. Rodgon then attempted to withdraw all of the motions he had filed.

The judge refused to allow this and again said that he would appoint Rodgon. Tr. 130. Rodgon acceded to the court's proposal.

The three defendants' cases were tried simultaneously before three separate juries. Direct examination of the prosecution witnesses proceeded before all three juries, and each defendant had the opportunity to cross examine each witness before the jury hearing his case. In his opening statement, Rodgon told the jury that "Mr. Hampton will testify and tell you that he was at the concert. Mr. Hampton will tell you that he saw what happened but he was not involved with it." Tr. 543. He also promised that "[t]he evidence will show that my client is not a member of any gang nor a part of a gang." Tr. 544.

Keith Powell testified that near the end of the concert, he saw a group of men coming down the aisle toward the stage, making gang signs and chanting gang slogans. He identified Hampton, Knight, and Mallory as members of the group. As they approached the stage, he saw a fight and then saw a naked woman. Powell saw Knight throw some pants into the air. Powell rode a bus home from the concert and saw all three defendants with others on the bus. He overheard a conversation in which someone – he could not say who – was bragging about putting their fingers into a woman and taking her jewelry. He called the police department the next day and eventually identified Knight from a photograph. On cross-examination, Rodgon brought out that Powell had not seen Hampton attack anyone and did not hear him say anything on the bus. Powell claimed that he had identified Hampton in a lineup – but the evidence later showed that in fact he had identified someone else.

William Henrichs, a Cook County Sheriff's officer moonlighting as a security guard and working the concert, testified that just after midnight, a woman with torn clothes approached him

3

and told him that others were being attacked in front of the stage. He approached the stage area with other guards and saw a large crowd of black men in a circle. The guards pushed their way in, and Henrichs saw a man and a woman on the ground being beaten. Henrichs said that he saw a young black man, whom he identified as Hampton, whose arm was thrusting toward the woman's vaginal area. Another guard pulled the man off her. Henrichs testified that on January 6, 1982, he identified Hampton and three others as participants. On cross examination, Rodgon elicited that Henrichs had seen the man for only "as long as it would take to ... run approximately ten feet," Tr. 713, likely just a couple of seconds, and no more than three or four. He also established that Henrichs had no contact with the police, and had not identified Hampton, until after he had seen Hampton's picture for at least sixty seconds on a television news program (after Hampton's arrest).

The male victim, H.N.,[2] testified that when he and the two women saw the men move toward the front of the stage, they tried to leave, but their path was blocked and they were attacked. He tried to shield D.M., but he was hit and kicked, his clothes were ripped off, a man whom he identified as Ricky Knight hit him and D.M. with a chair, and they fell to the ground. H.N. looked up and saw a number of men around them with their zippers down and their penises out, and Knight tried to put his penis into D.M.'s mouth. H.N. testified that he had identified Knight from photographs and in a lineup. He made no identification of Hampton.

D.M. testified that as she and the others started to leave, their passage was blocked by fifteen to twenty men who attacked them. She was pushed, touched on her breasts and vaginal area, and hit with fists, as was H.N. Someone hit them with a chair and they fell to the ground.

---

[2] The Court will refer to the three victims by their initials.

4

She saw several men with their penises out. One, whom she identified as Knight, tried to put his penis into her mouth, as did another whom she identified as Mallory. Several of the men were sitting on her legs, and one tried to pull them apart. She saw another one – whom she identified as Hampton -- moving his hands, and she felt something cold and hard that she said he was trying to put into her. D.M. was hospitalized and required stitches in her vaginal area and ended up with a bladder infection and scarring on her breast. She testified that she had identified Hampton from photographs and Knight, Mallory and Hampton in lineups. On cross examination, Rodgon elicited that she was frightened, had lots of men attacking her, was trying to concentrate on the faces of the men who tried to put penises in her mouth, and could not say how long she had seen the face of the man between her legs. He also established that she had been unable to describe this man in any way other than as a black male.

M.N. said that she ducked when she saw Knight about to hit her with a chair and that a number of men then started hitting and kicking her. There were as many as thirty or thirty-five men around her, and her necklace was pulled off. A man who she identified as Hampton tore her pants and tried unsuccessfully to put his hand into her vagina. She managed to get away, heard someone say "get her," and turned and saw that it was a man she identified as Knight. She later picked Hampton and Knight out of a lineup. On cross examination, Rodgon brought out that the scene was chaotic, she was scared, and she had seen the face of the man who tried to put his hand into her vagina for only four or five seconds. She was not able to describe him or anything he was wearing when she was interviewed by the police.

Chicago Police detective Thomas Ptak testified about various matters concerning the investigation; on cross-examination, Rodgon elicited that he had prepared a report about a lineup

in which he had stated that M.N. identified Ezra Gardner (not Hampton) as the man who had put his hand into her vagina.  The prosecutor elicited from Ptak that this was an error and that a report of M.N.'s interview indicated that she had identified Hampton.

We have omitted a description of the cross-examinations conducted by counsel for Knight and Mallory, but they followed the same lines as Rodgon's.  Knight called no defense witnesses, introducing only a short stipulation (before his jury only) that a detective had testified that the investigation had showed that it was Mallory – and thus presumably not Knight – who had put his penis into D.M.'s mouth.

Hampton did not testify in his own defense, despite Rodgon's promise in his opening statement.  Rodgon put on a defense case that consumed barely five pages of transcript and consisted of only one witness, a police detective who testified that Powell had never picked Hampton out of a lineup.

Mallory called several witnesses in his defense.  One testified that Mallory was not a member of a gang.  Another testified that she had been with Mallory at the concert and that he had not participated in the attacks; she also stated that he was not a gang member.  A third, Gregory Hubbard, confirmed the second witness' testimony on both counts, and also stated that he had not seen Hampton, Knight, or Mallory in the attacks (only Mallory's jury heard this testimony).  Mallory's brother Gregory testified that he had attended the concert, saw the people being attacked nearby where he was sitting, and did not see Mallory participating.  On cross examination he testified, among other things, that Hampton was not a gang member – but again, Hampton's jury did not hear this testimony.

Ronald Mallory also testified in his own defense.  He conceded that he had falsely told

6

the police that he had not seen anyone he knew at the concert and that he never left the balcony during the concert. He denied participating in the attacks, stating that he was with the woman who had testified in his defense. Mallory stated that he saw only two men he recognized in the concert crowd – Ezra Gardner and Michael Neal.

In closing argument before Hampton's jury, Rodgon vigorously attacked the testimony of Keith Powell (even though Powell had not identified Hampton as actually participating in the attacks or saying anything on the bus), accusing Powell of lying in various respects. He also challenged Henrichs' testimony, noting that he had not come forward and had not identified Hampton until after seeing his picture on television. He pointed out that H.N. had not identified Hampton, and he challenged the identifications of Hampton by M.N. and D.M., saying they had gotten only fleeting glimpses of their attackers under extremely stressful conditions. Rodgon did not explain to the jury why his promise that Hampton would testify went unfulfilled, other than to assert that Hampton was not required to prove his innocence. Nor did he explain why he had not fulfilled his promise to offer evidence that Hampton was not a gang member.

The jury acquitted Hampton of the attempted rape of M.N. but convicted him on all other charges, including deviate sexual assault, attempted rape of D.M., aggravated battery, and robbery (the prosecution had argued each defendant's accountability for offenses committed by the group). Knight was found guilty on all charges. However, the jury acquitted Mallory on all charges, despite Powell's identification of Mallory and D.M.'s testimony that Mallory had tried to force his penis into her mouth.

At sentencing, the trial judge stated that the attacks were "probably the most [aggrievously] cruel, wanton, depraved, brutal, [heinous,] animalistic activity that I have run into

in some thirty five years in the practice of law as a prosecutor, as a defense counsel and as a Judge." Tr. 11/19/92, p. 37. He sentenced Hampton to the maximum term for deviate sexual assault, 30 years, and then doubled the maximum sentence to sixty years, relying on Ill. Rev. Stat. ch. 38, §1005-5-3.2(b)(2), currently found at 730 ILCS 5/5-5-3.2(b)(2). That statute provided that the sentence for a felony conviction could be extended if "the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." The judge stated that he extended Hampton's sentence because of the use of a foreign object. He also sentenced Hampton to concurrent sentences of fifteen years for attempted rape, seven years for three counts of robbery, and five years for three counts of aggravated battery.

Hampton appealed from his conviction and sentence, challenging the sufficiency of the evidence, the legality of his extended term sentence under Illinois law, and the constitutionality of his warrantless arrest. The Illinois Appellate Court rejected these arguments, finding (among other things) no abuse of discretion in the trial judge's sentencing. *People v. Knight*, 139 Ill. App. 3d 188, 486 N.E.2d 1356 (1985). Hampton's petition for leave to appeal was denied by the Illinois Supreme Court in 1986, and his petition for certiorari to the United States Supreme Court was denied in 1987.

In 1990, Hampton filed a petition for post-conviction relief in state court. In that petition, he argued that Rodgon had rendered ineffective assistance of counsel by failing to investigate and interview exculpatory occurrence and character witnesses (regarding his lack of gang involvement); failing to fulfill his opening statement promise that Hampton would testify; performing in a deficient manner in several respects at trial; and failing to investigate and present mitigating evidence at sentencing. Hampton also argued that he had been denied his right to

testify in his own defense. The petition included an affidavit from Hampton. In the affidavit, he stated that before trial he had given Rodgon the names, addresses, and telephone numbers of three witnesses, Gregory Mallory, Clinton Williams, and Ronnie Garner, and told Rodgon that they would confirm that he was not involved in the attacks. Hampton also stated that if his attorney had asked him for the names of character witnesses, he would have provided the names of several specific individuals. The petition included affidavits from Williams and Garner stating that they had attended the concert and had seen Hampton, and that he was not involved in the attacks; they confirmed that Hampton's lawyer had never contacted them. It also included affidavits from several friends and acquaintances of Hampton who stated that he was not involved in a gang and was a peaceful, law-abiding, and respectful person. Hampton requested an evidentiary hearing.

The prosecution responded, asking the trial court to dismiss the petition without holding an evidentiary hearing. The court dismissed Hampton's petition in 1995 after holding an evidentiary hearing that explored only the issue of Hampton's right to testify. It declined to hold an evidentiary hearing on Hampton's ineffective assistance claim.

Hampton appealed from the denial of his post-conviction petition. The Illinois Appellate Court, by the vote of a 2-1 majority, rejected Hampton's claims. *People v. Hampton,* No. 1-95-4282 (Ill. App. June 8, 1998). With regard to his ineffective assistance claim, the majority cited *Strickland v. Washington* and found that Hampton's claim failed both prongs of the test: (1) objectively unreasonable performance that (2) prejudiced the result by undermining confidence in the outcome of the trial. The court gave short shrift to the claim of failure to investigate and present character witnesses. It stated that Rodgon's failure to call these witnesses was a matter of

9

strategy and that "in light of the victims' and the security guard's identification of defendant," it was not unreasonable for him not to call witnesses who, as the court characterized it, "would have claimed that defendant was a 'decent' person." *Hampton,* slip op. at 16. The court made no mention of the fact that these witnesses would have testified that Hampton was not a gang member.

On the issue of failure to investigate and call the occurrence witnesses, the majority said that "the decision whether to present witnesses is a matter of trial strategy or tactics and cannot support a claim of ineffective assistance of counsel," *id.* at 6 (citing *People v. Ashford,* 121 Ill.2d 55, 74 (1988)), and that "'[c]ounsel has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary, and the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment.'" *Id.* (quoting *People v. Orange,* 168 Ill. 2d 138, 149 (1995)). The majority described the evidence submitted by Hampton supporting his claim that he had given the names of several witnesses to counsel but that counsel had not contacted them. *Id.* It addressed the claim as follows:

> Defendant's defense was that he was with the other defendants, saw the crime, left with the perpetrators, but was not involved. The testimony of these other witnesses would have been redundant and only serve to emphasize the fact that defendant went to the concert with the perpetrators, was present during the assault, and left with the perpetrators. It is not unreasonable for defense counsel to find this troubling. Indeed, it was defense counsel's assessment that defendant faced a problem of "guilt by association." Applying a heavy measure of deference to defense counsel's judgment, we conclude that in light of the surrounding circumstances, trial counsel made a reasonable decision to not interview these witnesses.

*Id.* at 7. Unexplained by the majority was how the witnesses' testimony of Hampton's non-

10

involvement possibly could have been "redundant" of anything, as no such evidence was presented at trial; how it could make an assessment of what defense counsel found "troubling," in the absence of any evidence of defense counsel's *actual* rationale; or what basis it had to say that defense counsel had made any sort of "judgment" or "decision" at all in failing to interview the witnesses, let alone a reasonable one.

Judge Sheila O'Brien dissented on the failure to investigate issue, stating that she would reverse and remand for an evidentiary hearing. Judge O'Brien stated:

> Defendant's affidavit states that he gave the names, addresses and phone numbers of four witnesses who could corroborate his version of the events in question to his counsel. It is uncontroverted that those four witnesses received no communication from counsel. Surely the defendant, if he desired, should have had the same opportunity to present occurrence witnesses who corroborated his version of the events, as the State had to present its occurrence witnesses. The majority explains away the significance of two of the four witnesses, Mallory and Powell, but is noticeably silent about the significance of William and Garner.

> This crime occurred in a large area, with hundreds of people present. Defendant could have been present in the area and not have participated in the events and these occurrence witnesses could have corroborative information. These allegations make a substantial showing of a violation of defendant's constitutional rights.

*Id.* at 21.

The Appellate Court unanimously rejected the remainder of Hampton's ineffective assistance claim as well as his other contentions on appeal. The Illinois Supreme Court denied Hampton's petition for leave to appeal in October 1998.

### Hampton's habeas corpus petition

Hampton filed a *pro se* habeas corpus petition in this Court in August 1999. In April 2000, the Court appointed Douglas Whitney of the Federal Defender Program to represent

Hampton. After investigating the matter, counsel filed a supplemental petition in September

2000. The State answered both the *pro se* and the supplemental petitions. The Court

determined, over respondent's vigorous objection, that an evidentiary hearing was required on

the failure to investigate claim. At the hearing, the Court heard testimony from Hampton,

Rodgon, Michael Fay (Ronald Mallory's trial counsel), Harold Winston (Hampton's appointed

post-conviction counsel), Ronnie Garner, and Gregory Mallory.

Hampton testified that Rodgon had successfully defended Hampton's brother in a

previous case and that his family hired Rodgon to defend him against the sexual assault charges.

Hampton remained in custody pending trial, and Rodgon visited him at the Cook County Jail

only once. The only other times he saw or spoke to Rodgon were when he was in court or the

holding cell adjacent to the courtroom. On these occasions, Rodgon would simply report what he

expected to happen in court that day or at the next court date. He did not send Hampton copies

of court filings, and he neither showed Hampton nor discussed with him the witness list he filed

with the court.

Hampton's single meeting with Rodgon at the jail took place just after arraignment and

eight months before trial. At that meeting, Hampton told Rodgon that he had been with Ronnie

Garner, Clinton Williams, and Gregory Mallory at the concert, and that they could verify that he

was not involved in the assaults. Though Garner was, at the time, a co-defendant in the case (he

later pled guilty and received a sentence of probation), Williams and Mallory had not been

charged. All three were Hampton's friends and lived in the same public housing project where

he lived; Hampton gave Rodgon their phone numbers and addresses. Hampton also testified that

on one occasion prior to trial when Williams and Mallory came to court, he pointed them out to

12

Rodgon. In addition, Rodgon's commitment in opening statement to produce evidence that Hampton was not a gang member is strong circumstantial evidence that Hampton had told Rodgon this prior to trial.

Hampton assumed that Rodgon would interview these witnesses, and when it came time for trial, he assumed they would testify in his defense. When he did not see them in court, he became concerned and asked Rodgon whether it was time for his witnesses to testify; Rodgon replied, "not yet." When Rodgon announced to the court that the defense was resting its case, Hampton asked him why he had not called the other witnesses to testify. Rodgon told him not to worry and that everything would be all right. In his testimony at the hearing, Hampton acknowledged that at the time he said nothing to the trial judge about these exchanges – though that is neither particularly surprising nor significant, in view of his lack of experience with the criminal justice system.

In fact, Rodgon had not so much as lifted a finger to try to contact Hampton's witnesses. At the hearing, he testified that he did not believe that Hampton had given him any information about possible witnesses, saying that if Hampton had done so, he would have tried to interview the witnesses. But fourteen years ago, Rodgon gave a materially different story to the Illinois Attorney Registration and Disciplinary Commission in a letter he wrote in response to a complaint by Hampton. In that letter, dated July 10, 1987, Rodgon admitted that he had spoken with Hampton concerning witnesses that might be called in his defense. He told the ARDC that "most" of those witnesses were co-defendants – an admission that some were not. Rodgon's letter to the ARDC gave no indication that he had interviewed any of the witnesses whose names Hampton had given him, either the co-defendants or the non-co-defendants. *See* Petitioner's

Exhibit 1E. And indeed, Rodgon's file contained no interview memoranda or notations of any kind suggesting that he had interviewed any witnesses.

Based on the Court's assessment of the credibility of Hampton and Rodgon, we find that Hampton in fact told Rodgon, well before trial, that Ronnie Garner, Clinton Williams, and Gregory Mallory could provide exculpatory testimony, and that Rodgon did nothing to follow up. Rodgon testified that he would have had a reason for this with respect to Garner: the ordinary practice in the Criminal Court was to have any defendant who pled guilty in a multiple defendant case admit the co-defendants' guilt as well, thus making it effective impossible for them to testify as defense witnesses. Strictly speaking, this did not happen in Garner's case; the transcript of his guilty plea reflects that he was not asked to stipulate to the prosecutor's recitation of the events. *See* Petitioner's Exhibit 11, pp. 31-32. But that recitation – which included a statement of Hampton's involvement – was nonetheless made in Garner's presence, without objection by him or his attorney. Rodgon testified that he did not feel that putting a convicted co-defendant on the stand as a defense witness would make sense from a strategic standpoint.

But with respect to the non-co-defendant witnesses (Gregory Mallory and Clinton Williams), Rodgon's failure to follow up was not a decision made for tactical or strategic reasons. Indeed, Rodgon acknowledged in his testimony that the decision whether to put a witness on the stand in these circumstances cannot be made without first interviewing the witness. In Hampton's case, however, Rodgon acted by default: he simply did not pursue the matter. This contrasts strikingly with his actions on behalf of one of Hampton's co-defendants, Bobby Brooks, whom he also represented: Rodgon had an investigator interview Ray Lyons, a witness who, it appears, could provide Brook with an alibi. *See* Petitioner's Exhibit 3. The

14

evidence presented at the hearing indicated that Brooks, unlike Hampton, was a paying client of Rodgon's.

Rodgon's lackadaisical approach to Hampton's defense did not stop with his failure to contact the witnesses whose names, addresses, and telephone numbers he had gotten from Hampton. At the hearing, Rodgon acknowledged that he was aware that a group of people from the housing project where Hampton lived had attended the concert, and that it was reasonable to assume that some of those people could have witnessed the attack. But unlike the attorneys representing Hampton's co-defendants, Rodgon made no effort to locate any possible defense witnesses, either personally or through an investigator. Nor is there any indication that he spoke with co-defendants' counsel after seeing their witness lists about whether their identified witnesses could provide helpful testimony on Hampton's behalf as well, or that he made any effort to contact those witnesses directly to find out for himself. We know from the record of the trial that one of them – Gregory Hubbard, who testified in Mallory's successful defense effort – could have exculpated Hampton. Finally, despite having been told by Hampton that he was not a gang member, Rodgon never asked Hampton for witnesses who could support such a claim, and he did nothing himself to try to find any such witnesses.

Ronnie Garner also testified at the hearing. He stated that he and Hampton had grown up together and that they were friends at the time of the concert and the trial (though he has not talked to Hampton since that time). Garner said that when the attack occurred, he saw Hampton, who was nowhere near the crowd that was attacking the young Latinos. There were some variations between the specifics of his version of the events and those of other witnesses at the trial, but that is not uncommon with eyewitness testimony, particularly in view of the passage of

nearly twenty years. The fact that Garner pled guilty does not undermine the credibility of his version of the events. He testified that he had pled guilty reluctantly, and though protesting his innocence, because he had been given an offer of "time served" and was facing a huge sentence if he went to trial and was convicted. The transcript of Garner's guilty plea hearing supports this claim; his lawyer made a clear indication that his client claimed innocence but was pleading guilty to avoid the possibility of a disastrous result. Overall, the Court found Garner to be a credible witness.

Gregory Mallory also testified at the hearing. Though currently a heroin addict, Mallory did not begin using heroin until 1989 and was not a drug user at the time of Hampton's trial (the relevant time in our analysis of the impact of Rodgon's actions). He was a neighbor and friend of Hampton. He testified that when the disturbance occurred, he saw Hampton, who never went near the area of the disturbance. Gregory testified at his brother Ronald's trial; as noted earlier, Ronald was acquitted. He would have been willing to testify on Hampton's behalf but was never contacted by Hampton's attorney. The Court found Gregory to be a credible witness. Unsurprisingly, given the passage of time and the effects of heroin use, his memory of the incident has faded a bit. But the issue is not whether he would make a good witness if Hampton's trial were held today, but what effect his testimony might have had at the 1982 trial. The Court finds that Mallory would have made an effective defense witness at that trial.

Clinton Williams died some years ago and thus was not available to testify at the hearing. But there is no reason to believe that there were any factors other than his friendship with Hampton that could have been used to impeach his testimony. There is no evidence, for example, suggesting that Williams (or, for that matter, Mallory) was part of the group of men

who had approached the stage. Williams' death in no way precludes the Court from considering

Rodgon's failure to contact him or call him as a witness. Again, the issue is not whether

Williams would be an effective defense witness today, but rather whether he should have been

contacted and called in 1982.

## Discussion

Hampton advances two arguments in his supplemental habeas corpus petition.[3] First, he

contends that his trial counsel was constitutionally ineffective. Second, he contends that his

extended-term sentence is incompatible with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We

address these claims in turn.

### A.    Ineffective assistance of counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to have the Assistance of Counsel for his defence." Hampton claims that

Rodgon was constitutionally ineffective in that he failed to adequately investigate witnesses,

misled Hampton about his right to testify, failed to fulfill promises made in his opening statement

to the jury, and failed to present any mitigating evidence at sentencing. We begin with the

second and fourth of these claims, which do not afford Hampton a basis for relief in this Court.

### 1.    Advice concerning right to testify

Hampton claims that Rodgon misled him regarding his right to testify, leading him to

believe that in the final analysis, it was Rodgon's decision to make, not Hampton's. After

---

[3] Hampton's initial *pro se* petition raised three claims that the supplemental petition does
not advance: (1) ineffective assistance of appellate counsel, (2) the impropriety of his arrest, and
(3) *Brady* violations. Because Hampton does not press these claims, we assume they have been
abandoned and thus need not address them.

17

hearing both Hampton and Rodgon testify, the judge who considered Hampton's post-conviction petition found that Rodgon had advised Hampton that it was "his call" whether to testify. *See Hampton,* slip op. at 19. The Appellate Court found that this ruling was properly supported by the evidence and thus rejected Hampton's claim. *Id.* at 20. We have been provided no basis on which to conclude that the court unreasonably applied federal law in reaching this decision. *See* 28 U.S.C. §2254(d)(1).

### 2.    Failure to present mitigating evidence at sentencing

The Appellate Court found that Hampton's claim regarding Rodgon's failure to present mitigating evidence at sentencing was waived because he had not provided the court with a transcript of the sentencing hearing. *Hampton,* slip op. at 16. Respondent argues that this constitutes an independent and adequate state law ground for the rejection of the claim which bars federal review. *See Coleman v. Thompson,* 501 U.S. 722, 729 (1991). Hampton does not contest the point and does not attempt to show cause and prejudice for the default. The Court agrees with respondent that Hampton committed a procedural default barring federal review of this aspect of his claim.

### 3.    Failure to investigate

### a.    Fair presentment and procedural default

Respondent argues that the Court may not properly consider on the merits Hampton's failure to investigate claim, or at least significant parts of it, due to various procedural barriers. The Court disagrees. First of all, Hampton fairly presented his claim to the state court. *See generally Picard v. O'Connor,* 404 U.S. 270 (1971). Though he did not include an affidavit from Gregory Mallory (we will refer to him as "Gregory" to distinguish him from Hampton's co-

defendant, Gregory's brother Ronald Mallory), Hampton's own affidavit stated that he had given Gregory's name to Rodgon, and he argued in his post-conviction petition and appeal that Rodgon should have interviewed Gregory and called him to testify. Thus Hampton's reliance on these same allegations in his habeas corpus petition does not constitute a material change to his ineffective assistance claim. The claims presented in state and federal courts need not be exact replicas of each other to satisfy the fair presentment requirement. *See Howard v. O'Sullivan,* 185 F.3d 721, 725 (7th Cir. 1999). The claim presented here is "the same [one] that the state courts were asked to resolve." *Boyko v. Parke,* 259 F.3d 781, 789 (7th Cir. 2001). The submission of Gregory's affidavit "'supplements, but does not fundamentally alter, the claim presented to the state courts.'" *Id.* (quoting *Caballero v. Keane,* 42 F.3d 738, 741 (2d Cir. 1994)). Accordingly, the omission of the affidavit in state court does not mean that Hampton's current claim was not fairly presented.

The Court reaches the same conclusion regarding Hampton's inclusion of the affidavit of Farod Poole, another friend of Hampton who says he would have testified that he witnessed the attacks and that Hampton was with him and did not participate. Hampton contends that even though he did not give Poole's name to Rodgon, if Rodgon had investigated, he would have located Poole. Hampton did not make any reference to Poole in his state post-conviction petition. The making of new factual allegations in support of a habeas corpus claim does not by itself lead to the conclusion that the claim was not fairly presented, *see Picard,* 404 U.S. at 277-78; *Chambers v. McCaughtry,* 264 F.3d 732, 738 (7th Cir. 2001), but the Seventh Circuit has said that a petitioner's "reformulation of his claim "cannot 'place the claim in a significantly different posture by making the claim stronger or more substantial.'" *Chambers,* 264 F.3d at 738

19

(quoting *Boyko*, 259 F.3d at 788). On the other hand, *Chambers*, the case upon which

respondent relies most heavily in this regard, concerned the *legal* reformulation of a claim, not

the making of additional factual allegations. *See Chambers*, 264 F.3d at 738-39. In *Boyko*, by

contrast, the Seventh Circuit held that the petitioner's inclusion in his federal habeas corpus

claim of an additional piece of evidence supporting his claim of self-defense and mental defect –

evidence that he claimed his trial counsel was ineffective for failing to uncover – did not make

his claim run afoul of the fair presentment requirement. *Boyko*, 259 F.3d at 789. The court's

comments apply equally here:

> The situation presented in this case is not one in which a petitioner seeks to
> present a ground of ineffectiveness that is entirely independent of the grounds
> presented in the state courts. ... The [additional evidence] does not change the
> substance of [petitioner's] arguments; instead, it merely supplies an additional
> piece of evidence that counsel would have found had he pursued self-defense or
> PTSD theories. In ruling on [petitioner's] habeas petition, the federal courts must
> resolve the same question that the state courts were asked to resolve, namely
> whether [petitioner's] trial counsel was ineffective in failing to pursue self-
> defense or PTSD theories. ... At most, then, we believe that the [additional
> evidence] "supplements, but does not fundamentally alter, the claim presented to
> the state courts."

*Id.* (footnote and citations omitted). For these reasons, the Court concludes that the inclusion of

Poole's affidavit does not lead to a conclusion that Hampton's claim was not fairly presented to

the state courts.

Nor does Hampton's failure to provide Gregory Mallory's affidavit in state court

constitute a procedural default barring the Court's consideration of that aspect of his claim on the

merits. Though the Appellate Court noted that Hampton had not submitted an affidavit from

Gregory, the court addressed his ineffective assistance claim on the merits in its entirety and did

not in any way rely on the fact that the affidavit was missing. Hampton is entitled to this Court's

review of his claim on the merits if "the last state court to address a question reaches the merits without invoking a rule of forfeiture." *Hogan v. McBride,* 74 F.3d 144, 146 (7th Cir.1996) (citing *Ylst v. Nunnemaker,* 501 U.S. 797 (1991), and *Coleman,* 501 U.S. at 732-35). There is no independent and adequate state ground barring federal habeas review if a state chooses to ignore or forgive non-compliance with its own rules. *Cawley v. DeTella,* 71 F.3d 691, 694 n.6 (7th Cir. 1995) (citing *Harris v. Reed,* 489 U.S. 255, 261-62 (1989)). Thus there is no procedural default precluding review in this Court.

### b.    Right to a hearing

The last potential procedural barrier to consideration of Hampton's claim arises from rules limiting a federal court's ability to conduct an evidentiary hearing in a habeas corpus case. The primary limitation comes from the 1996 amendments to the habeas corpus statute contained in the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which added a provision stating that "[i]f the [habeas corpus] applicant has failed to develop the factual basis of a claim in State court proceedings, the [federal] court shall not hold an evidentiary hearing on the claim" unless the petitioner meets fairly stringent prerequisites. 28 U.S.C. §2254(e)(2). Though §2254(e)(2) speaks only of evidentiary hearings, the Seventh Circuit recently held that it applies to any expansion of the record that is "used to introduce new factual information into the record in lieu of an evidentiary hearing." *Boyko,* 259 F.3d at 790. Thus in the present circumstances, the statute governs not just whether it was appropriate to hold an evidentiary hearing, but also whether the Court may consider the affidavits of Gregory Mallory and Farod Poole, which were

not provided to the state court, or the testimony of Mallory.[4]

The predicate for application of §2254(e)(2), however, is a finding that the petitioner "failed to develop the factual basis" of his claim in state court. The law is clear that if "the 'fail[ure] to develop the factual basis of a claim in State court proceedings' cannot be attributed to something the petitioner 'did or omitted,' Section 2254(e)(2) does not apply." *Matheney v. Anderson,* 253 F.3d 1025, 1039 (7th Cir. 2001) (quoting *Burris v. Parke,* 116 F.3d 256, 258-59 (7th Cir. 1997)). Under the statute, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor,* 529 U.S. 420, 432 (2000). The focus concerns the petitioner's diligence, not whether the facts were discoverable at the time of the state court proceedings. *Id.* at 435; *Boyko,* 259 F.3d at 791.

We begin with Gregory Mallory's affidavit and testimony. There is no evidence of any lack of diligence on the part of Hampton or his post-conviction counsel with regard to Mallory. With his supplemental post-conviction petition, Hampton submitted his own affidavit, in which he attested that he had given Mallory's name to Rodgon as an exculpatory witness. Hampton sought an evidentiary hearing in state court so that he could prove his claim, but the prosecution resisted this, and the trial court and Appellate Court both turned Hampton down. If an evidentiary hearing had been held, the facts concerning Mallory would have been set forth on the record by Hampton, and it is overwhelmingly likely that Mallory would have been called to testify. Having been rebuffed at the prosecution's behest in his attempt to make a complete

---

[4] Respondent has not argued that Hampton's failure to submit an affidavit from Rodgon with his post-conviction petition should preclude the Court from considering his testimony.

record in the state court, Hampton cannot be faulted for his failure to do so or accused of a lack of diligence. In sum, §2254(e)(2) does not preclude consideration of Mallory's affidavit or testimony.

We therefore evaluate Hampton's entitlement to consideration of Mallory's affidavit and testimony under pre-AEDPA standards. *Matheney,* 253 F.3d at 1039. Under those standards, an evidentiary hearing is required if the petitioner alleges facts which, if proved, would entitle him to relief, and the state courts, for reasons beyond his control, did not consider the claim in a full and fair hearing. *Id.; see generally Kenney v. Tamayo-Reyes,* 504 U.S. 1, 11 (1992). A "full and fair" hearing is one in which the petitioner "received 'careful consideration and plenary processing of [his claim,] including full opportunity for presentation of the relevant facts.'" *Porter v. Gramley,* 112 F.3d 1308, 1318 (7th Cir. 1997) (quoting *Blackledge v. Allison,* 431 U.S. 63, 82-83 (1977)). Though a "full and fair" hearing does not always mean an evidentiary hearing, *id.,* in this case we have no hesitation in concluding that the state court's failure to hold an evidentiary hearing on Hampton's failure to investigate claim deprived him of a full and fair hearing. The state court did not permit Hampton to explore his trial counsel's reasons – if he had any – for failing to interview and call the witnesses whose names Hampton had given him. Nor did it permit him to address the issue of prejudice, which would have required consideration of the effect of Mallory's testimony. As the court stated in *Matheney,* "[a]n adequate record is imperative to properly evaluate ineffective assistance claims." *Matheney,* 253 F.3d at 1040 (citing *United States v. Draves,* 103 F.3d 1328, 1335 (7th Cir. 1997)). Recently the Seventh Circuit, in evaluating a federal prisoner's ineffective assistance claim brought pursuant to 28 U.S.C. §2255 – the rough equivalent of Illinois' post-conviction remedy – held that a hearing was

23

required before a district judge could determine the validity of the prisoner's claim that his trial counsel had rendered ineffective assistance by failing to investigate and call alibi witnesses. The court so held even though trial counsel had provided his views on the point, submitting an affidavit in which he essentially denied the prisoner's claims. The Seventh Circuit reversed the district court's decision to rely on this affidavit without holding a hearing, concluding that "[t]estimony by defense counsel and the alibi witnesses presumably will enable the court to assess the adequacy of the representation ... and to determine whether that representation was prejudicial." *Bruce v. United States,* 256 F.3d 592, 600 (7th Cir. 2001). The state trial judge considering Hampton's post-conviction petition stood on less solid ground than did the district judge in *Bruce,* as she did not have the benefit of Rodgon's views at all. In sum, we can safely conclude that for reasons beyond his control, Hampton did not receive a "full and fair" hearing on his failure to investigate claim in the state court.[5] He is therefore entitled to consideration of Mallory's affidavit and testimony here.

We reach a different conclusion regarding Poole's affidavit. Our holding that the submission of Poole's affidavit does not make Hampton's claim run afoul of the fair presentment requirement does not mean that §2254(e)(2) is satisfied. *Bokyo,* 259 F.3d at 789. In contrast to Gregory Mallory, there was no mention of Poole in Hampton's state court submissions. Hampton has failed to explain how Poole's name would have come up if a hearing had been held in state court. Nor has he submitted any plausible theory as to why his state post-conviction counsel did not identify Poole. Under the circumstances, the Court has no alternative but to find

---

[5] If providing Williams and Garner's affidavits did not prompt the state court to hold a hearing, there is no basis to believe that providing one from Mallory would have changed things.

that Hampton lacked due diligence in the state court in this regard, thus barring this Court's consideration of Poole's affidavit.

### c.     The merits

We proceed to the merits of Hampton's failure to investigate claim. The Supreme Court has held that for a criminal defendant to demonstrate that he did not receive the effective assistance of trial counsel, he must show that (1) his attorney's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "The performance standard gives a wide latitude of permissible attorney conduct, and a prisoner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000) (quoting *Strickland*, 466 U.S. at 689). In addition, a court reviewing counsel's performance must "eliminate the distorting effects of hindsight, ... reconstruct the circumstances of counsel's challenged conduct, and ... evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. As the Seventh Circuit put it in *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990), a court "must quell the tendency to call the plays [it thinks] should have been called."

Under AEDPA, the Court may grant Hampton relief only if the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,"

or "if the state court confronts a set of facts that are materially indistinguishable from a decision

of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court]

precedent." *Williams v. Taylor,* 529 U.S. 362, 405 (2000). A state court decision runs afoul of

the "unreasonable application" provision if "the state court identifies the correct governing legal

rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular

state prisoner's case," or "the state court either unreasonably extends a legal principle from

[Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

extend that principle to a new context where it should apply." *Id.* at 407. Under this provision, a

federal court is required to defer to a reasonable state court decision. *Denny v. Gudmanson,* 252

F.3d 896, 899-900 (7th Cir. 2001); *Anderson v. Cowan,* 227 F.3d 893, 896-97 (7th Cir. 2000).

The first question is whether we are bound by the Illinois Appellate Court's determination

that Rodgon's failure to investigate was based on a strategy decision. *See Hampton,* slip op. at 7

(quoted at p. 10 *supra*). The answer is no. State court factual findings that are reasonably based

on the record are accorded a presumption of correctness, which may be overcome only by clear

and convincing evidence. 28 U.S.C. §2254(e)(1); *see Denny,* 252 F.3d at 900. Though there is

no question that a state appellate court may make a "factual" finding, *see Sumner v. Mata,* 449

U.S. 539, 546-47 (1981); *Mendiola v. Schomig,* 224 F.3d 589, 592 (7th Cir. 2000), in this case

the court's finding had no basis whatsoever – as the Seventh Circuit put it in *Mendiola,* it "rests

on thin air." *Mendiola,* 224 F.3d at 592. Neither the state trial court nor the Appellate Court had

any basis to determine why Rodgon had not interviewed Hampton's witnesses (either the

occurrence witnesses or the "character" witnesses); the finding that it was a strategic move was

entirely speculative.

The only source for the Appellate Court's view that Rodgon acted out of a desire to avoid the risk of "guilt by association" appears to be Rodgon's testimony at the hearing held in state court on the issue of his alleged failure to permit Hampton to testify in his own defense or properly advise him regarding his right to testify. *See* Tr. 10/26/95, pp. D32 & D39. But Rodgon's explanation for why he advised Hampton not to take the stand cannot reasonably be transmogrified into an explanation for his failure to perform a pretrial investigation – a completely different question that he was never asked. It cannot possibly be appropriate for the state courts to deny Hampton a hearing at which he would have been able to explore Rodgon's rationale for failing to investigate (if he could come up with one), but then use Rodgon's testimony on another topic to make a finding on the very point on which the same courts denied Hampton a hearing. Under the circumstances, the Appellate Court's finding regarding the purported justification for Rodgon's failure to investigate cannot be considered to have been reasonably based on the record.[6]

Even if §2254(e)(1)'s presumption of correctness somehow applied to the Appellate Court's finding, Hampton has easily satisfied his burden of rebutting it by clear and convincing evidence. Rodgon had no reason for failing to follow up with the non-co-defendant witnesses identified by Hampton or to do any search on his own; we know that much from his testimony at the hearing before this Court and the absence of any explanation in his 1987 letter to the ARDC. Rodgon conceded the obvious in his testimony before this Court: that a defense attorney's

---

[6] The Appellate Court's "finding" that the testimony of Hampton's occurrence witnesses "would have been redundant," *Hampton,* slip op. at 7, is difficult to fathom and has no basis in the record whatsoever. Because Rodgon presented no direct evidence supporting the theory that Hampton was not involved in the crimes, the testimony of Williams and Mallory could not possibly have been redundant of anything.

decision whether to call a non-co-defendant defense witness cannot be made without first interviewing the witness – at least barring some external factor known to the lawyer, such as a significant record of felony convictions or the irrelevance or immateriality of the witness' testimony. If Rodgon had interviewed the witnesses and decided not to call them, his decision reasonably could be chalked up as a strategic one. But a lawyer's blind defaults cannot reasonably be considered strategic.

In addition, the Appellate Court's assumption (for that is what it was) regarding Rodgon's rationale was either contrary to, or an unreasonable application of, *Strickland v. Washington*. *Strickland* says that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. But here there was no evidence of any "professional judgment," reasonable or otherwise, on Rodgon's part. The state court's assumption that he had a reason does not wash: the Seventh Circuit has made it clear that a reviewing court "should not ... construct strategic defenses which counsel does not offer." *Harris*, 894 F.2d at 878.

As the Supreme Court stated in *Strickland*, criminal defense attorneys owe their clients "a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691; *see also Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("as a general rule an attorney must investigate a case in order to provide minimally competent professional representation."). Rodgon did neither. It is fairly obvious, and not genuinely disputed, that Rodgon did nothing to investigate Hampton's case beyond reviewing what was within the four corners of the police reports and other materials he

received from the prosecution. And by his own admission, Rodgon's failure to investigate was not the result of a reasonable decision (or indeed, *any* decision) that it was unnecessary to do so: as we have noted, Rodgon admitted that no reasonable decision about calling non-co-defendant witnesses could be made without first interviewing them, or at least having an investigator do so.

The duty to investigate is particularly critical in a case like Hampton's, where the prosecution relied so heavily on eyewitness testimony that might have been rebutted effectively with the testimony of other eyewitnesses. *See, e.g., Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) ("[F]ailure to interview eyewitnesses to a crime may strongly support a claim of ineffective assistance of counsel."). Most cases are won or lost outside the courtroom -- that is, by investigation and preparation. We have little doubt that Rodgon was adequately prepared to cross-examine the prosecution's victim-witnesses, but he could not render Hampton effective legal assistance without making an effort to find out if he had more of a defense to present than that which vigorous cross examination could provide -- or determining, after analysis, that such a defense would not work. But he neither made the effort nor performed the analysis. As we have indicated, Rodgon acted by default, not strategy. For whatever reason -- whether it was active disinclination or mere inertia we do not know and need not decide -- he failed to follow up with the witnesses whose names Hampton had given him, and unlike his co-counsel he did nothing to find any witnesses on his own. As we have indicated, this was, by Rodgon's own admission, unreasonable. And if Rodgon's subjective admission is insufficient, we wholeheartedly agree that in the present circumstances, Rodgon could not reasonably determine whether to call the

witnesses without interviewing them or having someone do so.[7]

The Seventh Circuit has found unreasonable defense counsel's failure to call exculpatory witnesses even in cases when counsel has, unlike Rodgon, actually tried to contact them. In *Washington v. Smith, supra,* the court found ineffective assistance of counsel in a case in which an attorney had tried unsuccessfully to contact an alibi witness three times, failed to contact several others, and negligently allowed his one scheduled alibi witness to leave town during trial. 219 F.3d at 631-32. Rodgon's performance failed to reach the level of the performance of the attorney in *Washington* (which the court described as "fall[ing] painfully short of a reasonable investigation," *id.* at 631), as he never even tried to find the witnesses, let alone to determine whether they could assist in Hampton's defense.

The Seventh Circuit has also granted or affirmed the granting of habeas corpus petitions in cases in which defense counsel, like Rodgon, failed to investigate or call possible exculpatory witnesses. In *Sullivan v. Fairman,* 819 F.2d 1382 (7th Cir. 1987), the court held that defense counsel rendered ineffective assistance by failing to conduct a "thorough investigation of the available evidence." *Id.* at 1392. Defense counsel was aware of several exculpatory witnesses but made only perfunctory attempts to locate them and did not call them to testify at trial. As in this case, "'the record establishe[d] that counsel had reason to know, from an objective standpoint, that a possible defense ... [was] available.'" *Id.* at 1389 (quoting *United States ex rel.*

---

[7] With regard to Ronnie Garner, Hampton's co-defendant who had pled guilty, Rodgon had a reasonable basis not to bother contacting him. Even though Garner did not directly stipulate to Hampton's guilt when he pled guilty, he stood by silently as the prosecutor recited a factual basis that directly implicated Hampton. Rodgon reasonably could have concluded that putting Garner on the stand in these circumstances (to deny Hampton's guilt and also, evidently, his own, despite his guilty plea) would have harmed Hampton's defense.

*Rivera v. Franzen,* 794 F.2d 314, 316 (7th Cir. 1986)). At a hearing held on the habeas corpus

petition, counsel said only that he thought (without having interviewed them) that some of the

witnesses were not to be believed. *Id.* at 1387. The court rejected the respondent's claim that the

decision not to pursue these witnesses was reasonable from a strategic standpoint, stating that "an

attorney who fails even to interview a readily available witness whose noncumulative testimony

may potentially aid the defense should not be allowed automatically to defend his omission

simply by raising the shield of 'trial strategy and tactics.'" *Id.* at 1389 (quoting *Crisp v.*

*Duckworth,* 743 F.2d 580, 584 (7th Cir. 1984)).

In *Harris v. Reed*, the Seventh Circuit granted a writ of habeas corpus to a petitioner

whose trial counsel had failed to interview and did not call two exculpatory witnesses whose

names were in police reports. *Harris*, 894 F.2d at 879. Counsel had stated that his primary

reason for this was that he felt the prosecution's case was weak and that an acquittal was likely.

*Id.* at 878. The court held that counsel's decision not to present the witnesses – "a decision made

without interviewing the witnesses, after preparing the jury for the evidence through the opening,

and without consultation with [the defendant] – was unreasonable professional conduct." *Id.* at

879.

In *Williams v. Washington,* 59 F.3d 673 (7th Cir. 1995), the court affirmed the granting of

a habeas corpus petition in a case in which defense counsel, among other things, had failed to

investigate witnesses who could have undermined the credibility of the prosecution's witnesses.

The court concluded that "[i]n light of ... the potential of this evidence to diminish [the

prosecution witness's] credibility, it was not reasonable for counsel to fail to investigate or

develop it. It should have been clear to counsel prior to trial that these various sources of

evidence might have had bearing on the credibility issues involved in this case." *Id.* at 681. *See also id.* (citing *Montgomery v. Petersen*, 846 F.3d 407, 412 (7th Cir. 1988) for the proposition that a "nonstrategic decision not to investigate is inadequate performance"). *See also, e.g., Stevens v. Delaware Correctional Center*, 152 F. Supp. 2d 561 (D. Del. 2001) (finding ineffective defense counsel who did nothing to contact potential defense witnesses); *Fargo v. Phillips*, 129 F. Supp. 2d 1075 (E.D. Mich. 2001) (finding ineffective a defense attorney who only interviewed two of the three alibi witnesses).

In sum, Rodgon's failure to contact Hampton's non-co-defendant eyewitnesses constituted performance below an objective standard of reasonableness, and the state court's contrary conclusion is an unreasonable application of *Strickland v. Washington*. If Rodgon had done something to pursue the witnesses Hampton identified for him, and then decided that it was a dead end or that the witnesses' testimony would be a liability to Hampton's defense, we perhaps would be required to defer to the presumption that he had rendered effective assistance. *See, e.g., United States v. Donaldson*, 978 F.2d 381, 395 (7th Cir. 1992) ("Given the live testimony of five other eyewitnesses, counsel's failure to call a witness who questioned the identity of the robber in the second Citibank robbery does not undermine our confidence that the jury reached a just result."). But we cannot do so in a case in which defense counsel made no effort to pursue any of these matters.

Rodgon's objectively unreasonable performance as Hampton's defense counsel is not limited to his failure to interview the exculpatory witnesses Hampton had identified. He was also required to make some reasonable effort on his own to at least try to find out if other possible exculpatory witnesses existed. If Rodgon had simply paid attention to the witnesses identified by

counsel for Hampton's co-defendants, he would have found at least one such witness, Gregory Hubbard, who testified as part of Mallory's successful defense.

In addition, from his conduct at trial, it is clear that Rodgon realized that evidence that Hampton was not a gang member could be important to his defense; he emphasized this to the jury in his opening statement. But when Hampton told Rodgon, before trial, that he did not belong to a gang, Rodgon never asked him for the names of anyone who could support his claim, and he did nothing (such as interviewing Hampton's neighbors and friends) to find any such witnesses on his own. This was objectively unreasonable. As Hampton's post-conviction petition showed, there was no shortage of witnesses who could have testified to his lack of gang involvement. The prosecution's evidence showed that the assailants of the three Latinos came from a group of gang members who were vocal and visible in their gang affiliation; showing that Hampton had nothing to do with a gang could only have helped in trying to undercut the identification testimony at trial.

The Appellate Court's rejection of this aspect of Hampton's claim was premised on a factual finding that was contrary to the record. The court stated that Rodgon was not incompetent "for failing to call witnesses who had no knowledge of the events at issue *but would have claimed that defendant was a 'decent' person.*" *Hampton,* slip op. at 16 (emphasis added). But the record (Hampton's supplemental post-conviction petition and the attached affidavits) was crystal clear that the gist of the witnesses' testimony would be that Hampton was not a gang member, not merely that he "was a decent person." The difference is significant. If all the witnesses were going to say was that Hampton was a person of good moral character, then a decision not to use them would have been a reasonable one. But testimony that Hampton was

33

not a gang member, as we have indicated, would have assisted in directly challenging the identification testimony given by Keith Powell and the victims. Assuming for purposes of discussion that the Appellate Court's statement is a "finding" that might be subject to §2254(e)(1)'s presumption of correctness, the presumption has been overcome by clear and convincing evidence. Moreover, the court's erroneous description of Hampton's proposed evidence infected its ruling on the merits of his claim, making that ruling an unreasonable application of *Strickland*. As with the occurrence witnesses, there is no basis for a claim that Rodgon made a strategy decision not to investigate or call the "no gang involvement" witnesses. Again, he acted by default, simply failing to follow up. This constituted objectively unreasonable performance.

Having shown ineffective assistance, Hampton must demonstrate that Rodgon's unprofessional performance prejudiced his defense, meaning that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. This issue was addressed by the Appellate Court in a single sentence: the Court said that "[i]n light of the overwhelming evidence of defendant's guilt, *i.e.*, two of the victims and a security guard identified defendant, defendant cannot establish that but for his defense counsel's performance the outcome of the trial would have been different." *Hampton*, slip op. at 5.

This one-sentence rejection of Hampton's prejudice argument, which included no analysis of the evidence, was an unreasonable application of *Strickland*. Though the prosecution's witnesses rendered powerful testimony against Hampton, the prosecution's case was far from unassailable. The security guard, Henrichs, conceded that he saw the man whom he

34

identified as Hampton for only three or four seconds, and he did not identify Hampton until after seeing a picture of him on the television after Hampton was arrested. D.M. and M.N. both saw the man they identified as Hampton for only a few seconds and were unable to give the police descriptions of their attackers other than that they were black men. And H.N. never identified Hampton, even though he held onto D.M. on the ground as she was assaulted and thus had a good vantage point. All of these witnesses saw the assailants under extremely stressful conditions, in near-riot conditions. They may have been certain about their identifications, but a jury had ample basis to doubt them.

That a different outcome was reasonably probable if Rodgon had done his job is indicated by the jury's acquittal of Hampton on the charge of attempted rape of M.N. M.N. had positively identified Hampton as one of her attackers. D.M. and Henrichs had made their identifications under the same difficult circumstances and with a similarly brief opportunity to see the attacker, but that was not enough to shake the jury's reliance on their identifications. With M.N., however, Rodgon was able to elicit evidence suggesting that M.N. had originally identified someone else. Even though this evidence was shown by the prosecution to be questionable at best, the jury acquitted Hampton of the attempted rape of M.N. Though we obviously cannot determine with certainty the reason for that decision, it is reasonable to infer that the jury may have concluded that under the totality of the circumstances, M.N.'s identification was insufficient to prove Hampton's guilt beyond a reasonable doubt. This suggests that if it had been given reasons to doubt D.M.'s and Henrich's identifications beyond argument about the circumstances under which they were made, there is a reasonable probability that the jury's decision on the other charges would have been different.

Ronald Mallory's acquittal also provides powerful evidence that a different result was reasonably probable had Rodgon performed an adequate investigation. Mallory's counsel put on eyewitness testimony of the very type that Rodgon failed to pursue, including Gregory Mallory, Ronald's brother and one of the exculpatory witnesses Hampton had identified to Rodgon. Ronald was acquitted despite a positive identification by D.M., who testified that he tried to put his penis in her mouth, as well as the testimony of Keith Powell that Ronald had been among the ground of gang members who walked toward the stage. Though we recognize that the case against Mallory was different from that against Hampton (Henrichs did not identify Mallory), the result of Mallory's case indicates that if the jury had been given a reason to doubt D.M.'s testimony beyond what could be established on cross-examination, there would have been a reasonable probability of a different outcome in Hampton's case as well.

Finally, though perhaps not enough by itself to require granting Hampton's petition, Rodgon's failure to investigate or call any witnesses to refute the claim of Hampton's gang involvement was highly prejudicial to Hampton's defense. As we have explained, gang involvement was a significant aspect of the prosecution's case that tended to buttress the identification testimony. Creating a doubt about Hampton's involvement in a gang would have served to bring into question the likelihood of his presence among the group that initiated the attacks and thus would have cast doubt on the identifications.

In sum, there is a reasonable probability that had Rodgon performed an adequate investigation, the result of Hampton's trial would have been different. *Strickland*, 466 U.S. at 694. *See also Griffin v. Warden*, 970 F.2d 1355, 1359 (4th Cir. 1992) (finding ineffective assistance for failure to present exculpatory evidence); *Montgomery v. Petersen*, 846 F.2d 407,

36

415 (7th Cir. 1988) (citing the fact that "the petitioner has pointed to a specific witness whose missing testimony would have been exculpatory" and finding prejudice from counsel's failure to call that witness).

### 4. Failure to fulfill promises in opening statement

Hampton also claims that Rogdon rendered ineffective assistance by failing to fulfill the promises he made in opening statement. Rodgon said that "Mr. Hampton will testify and tell you that he was at the concert. Mr. Hampton will tell you that he saw what happened but he was not involved with it." Tr. 543. The jury never heard that Hampton was not involved with the attacks; he never took the stand. Rodgon also claimed that the evidence would show that Hampton "is not a member of any gang nor a part of a gang. . . ," Tr. 544, but he failed to present a single witness to support that assertion.

The Appellate Court considered this claim on the merits and rejected it. The court found that the switch resulted from "a change in trial strategy." *See Hampton,* slip op. at 8. This finding had no basis whatsoever in the record, and any presumption of correctness that may attach to it has been rebutted by clear and convincing evidence. *See* 28 U.S.C. §2254(e)(1). As the Appellate Court explained it, Rodgon was concerned about the problem of "guilt by association." *Hampton,* slip op. at 8. In other words, he was concerned that Hampton's testimony that he attended the concert with some of the perpetrators, saw the melee, and left with some of the perpetrators would present "just a terrible problem, I think, of association." Tr. 10/26/95, pp. D32-D33 (Rodgon testimony at post-conviction hearing). But assuming this was so, it was equally so before the trial began; no one has pointed to anything that occurred at the trial that changed things in this regard. In short, the record reflects no change in trial strategy. If

Rodgon knew before trial what Hampton would say if he testified, the "guilt by association" problem existed and was known to Rodgon *before* he gave his opening statement, and under the circumstances it was foolhardy and objectively unreasonable for him to promise that Hampton would testify. And if Rodgon did not know before trial what Hampton's testimony would be, he acted even more incompetently than we have already found.

An attorney's failure to fulfill promises made in opening statement is not often a successful basis for an ineffective assistance claim. The decision to change strategy during trial is often forced upon defense counsel by the vagaries of the courtroom arena. In *Schlager v. Washington*, 113 F.3d 763 (7th Cir. 1997), for example, defense counsel promised in his opening statement that evidence would be introduced, through Schlager and a medical expert, that a prescription drug Schlager had been taking caused side effects, including sleep disorders, nightmares, and psychotic behavior. *Id.* at 765. By the time the prosecution had finished its case, however, defense counsel was convinced that Schlager would encounter serious credibility challenges on the stand and that the medical expert would have to testify that the drug's side-effects had probably worn off by the time of the murder attempt. Accordingly, defense counsel declined to put on a defense and explained to the jury in his closing argument that the testimony of Schlager and the medical expert was unnecessary, as the prosecution had failed to prove all the elements of its case beyond a reasonable doubt. *Id.* at 767. The Illinois Appellate Court, a judge of this Court, and the Seventh Circuit found that this decision did not constitute ineffective assistance of counsel. The Seventh Circuit noted that the change of strategy "was not all that unusual, for sometimes trials take unpredictable twists." *Id.* at 769.

Hampton's case is unlike *Schlager* in several ways. Schlager's credibility problems were

quite severe, *see id.* at 764-66 (cataloguing the defendant's history of duplicity), and cross-examination likely would have been highly detrimental to his case. More importantly, unlike in this case, it was clear in *Schlager* that something had happened during the prosecution's case that caused counsel to evaluate the matter differently: among other things, counsel had succeeded in convincing the court to allow the jury to hear during the prosecution's case taped evidence that set up a defense of lack of intent. *See id.* at 766. Things were different in Hampton's case; as we have indicated, nothing happened during the prosecution's case that changed matters. And though Hampton, if he had testified, would have had to explain his presence at the scene, Mallory was able to do so, and he was also able to navigate his way through an admission that he had initially given a false exculpatory statement to the police. Finally, unlike counsel in *Schlager*, Rodgon failed to explain in his closing argument why he had not put on the evidence he had promised.

Part of the performance found deficient by the Seventh Circuit in *Harris v. Reed* was counsel's inexplicable failure to present the testimony of witnesses that had been promised in opening statement. *Harris*, 894 F.2d at 879. Under the particular circumstances of this case, Rodgon's making of the promises in opening statement, and then failing to fulfill them, constituted objectively unreasonable performance. The Appellate Court's contrary conclusion, based on a finding that was without any support in the record, was an unreasonable application of *Strickland*.

Rodgon's unreasonable performance was prejudicial to Hampton. After Rodgon promised that the jury would hear Hampton declare his innocence and evidence that he was not a gang member, the absence of this testimony created a negative inference against Hampton. *See*

39

*Washington*, 219 F.3d at 634 (noting that failure to call witnesses mentioned at jury voir dire created "a negative inference against [the defendant] based on their absence."); *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening."). Though it is difficult to say that this aspect of Rodgon's performance would, by itself, lead to a finding that a different outcome of the trial was reasonably probable if he had performed properly, the prejudice that Hampton suffered significantly buttresses our conclusion that Rodgon's overall performance, which we have found objective unreasonable in several respects, affected the outcome of the trial.

**B.    *Apprendi* Claim**

Hampton's 60-year extended term sentence rests upon a sentencing statute that has now been declared unconstitutional by several Illinois appellate panels. *See, e.g., People v. Beachem*, 317 Ill. App. 3d 693, 700, 740 N.E.2d 389, 393-94 (2000); *People v. Lee*, 318 Ill. App. 3d 417, 421, 743 N.E.2d 1019, 1022 (2000); *People v. Lee*, 319 Ill. App. 3d 289, 307-08, 745 N.E.2d 78, 93 (2001). These courts found that the principles expressed by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), invalidated the extended term statute, 730 ILCS 5/5-5-3.2, which permits a sentencing judge to impose a sentence in excess of the statutory maximum upon making certain findings at the time of sentencing. In *Apprendi*, Justice Stevens, writing for the majority, held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Were Hampton sentenced today, he could receive no more than the maximum sentence of 30 years, unless a jury found beyond a reasonable doubt that his conduct was heinous, brutal, or cruel.

40

But Hampton was sentenced in 1982, not 2001. He is separated from relief under *Apprendi* by two significant obstacles. These include the rule that ordinarily bars federal courts from reviewing claims that were not presented to state courts, *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), and the principle that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion).

## 1.     Procedural default

Hampton failed to raise his Sixth Amendment attack on the extended term sentence in the state courts, either on direct appeal or in his post-conviction petition. This is a procedural default which precludes this Court from addressing the claim on its merits unless Hampton can show cause for the default and prejudice resulting from the failure to assert the constitutional claim. *Coleman*, 501 U.S. at 750. The unavailability of any reasonable legal basis for a novel constitutional claim can constitute cause for a petitioner's failure to raise it in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Reed v. Ross*, 468 U.S. 1, 16 (1984). To hold otherwise would encourage "defense counsel to include any and all remotely plausible constitutional claims that could, some day, gain recognition." *Reed*, 468 U.S. at 16. On the other hand, a claim is not considered unavailable if, at the time of the conviction, the defaulted argument had been adopted by some court or was fairly suggested by precedent. *See Bousley v. United States*, 523 U.S. 614, 622-23 (1998) (rejecting an unavailability argument by noting that "the Federal Reporters were replete with cases" involving the defaulted argument).

The Seventh Circuit recently noted that the foundation for *Apprendi* "was laid long before 1992" and suggested that a reasonable legal basis for *Apprendi*-like claims existed as early as

1986. *United States v. Smith*, 241 F.3d 546, 548 (7th Cir. 2001) (citing *McMillan v. Pennsylvania*, 477 U.S. 79 (1986)). But Hampton's conviction predated *McMillan* by four years, and his direct appeal was decided one year prior, in 1985. At the time of his trial and appeal, no reasonable legal basis existed for an *Apprendi*-like argument; it had not been adopted by any court and was not suggested by precedent. Either in state or federal court, the standard for reviewing sentencing decisions under the Illinois extended term statute did not reasonably allow for a claim that judicial findings of aggravating factors violated the Sixth Amendment's right to trial by jury. Indeed, the United States Supreme Court held in *Spaziano v. Florida*, 468 U.S. 447 (1984), that Florida's capital punishment scheme, whereby a trial judge could override a jury's recommended sentence of life imprisonment, did not violate the defendant's Sixth Amendment rights, as applied to the States via the Fourteenth Amendment. Although the defendant argued that allowing the trial judge to find aggravating sentencing factors, *e.g.* that the murder was "heinous, atrocious, and cruel," *id.* at 466, violated his Sixth Amendment right to a jury trial, the Court held that "the Sixth Amendment never has been thought to guarantee a right to a jury determination of . . . the appropriate punishment to be imposed on an individual." *Id.* at 459. Although the *Spaziano* decision arose from a capital punishment case, the Court was interpreting the Sixth Amendment right to a jury trial, and its holding applied *a fortiori* to non-capital cases. In sum, this Court concludes that the lack of a reasonable basis for an *Apprendi*-like argument in 1982 provides cause for Hampton's failure to make the claim.

With regard to prejudice, Hampton must show that the unavailability of *Apprendi* "worked to his actual and substantial disadvantage, infecting his entire [sentencing] with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986). As we have noted,

there is no question that *Apprendi*, if applied to Hampton's case, would have precluded the trial judge from making the findings that resulted in the extended-term sentence. Because the judge's finding of heinousness resulted in an additional 30 years in prison, it is clear that Hampton was substantially disadvanged at sentencing. In short, Hampton's procedural default of his *Apprendi* argument is excused, as he has shown both cause and prejudice.

### 2.     Retroactivity

Hampton does not so easily clear the other obstacle to consideration of his claim on the merits: *Teague v. Lane.* In that case, the Supreme Court held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310. The Seventh Circuit has not yet addressed whether *Apprendi* applies retroactively on collateral review. *See Ashley v. United States*, 266 F.3d 671, 674 (7th Cir. 2001) (noting that as of September 2001, the court had not yet decided the point).

The rule in *Apprendi* is a new constitutional rule of criminal procedure. Hampton argues that *Apprendi* is substantive, not procedural, and therefore exempt from the *Teague* bar, but the Court's own opinion stated that the "substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is." *Apprendi*, 530 U.S. at 475. *See also United States v. Sanders*, 247 F.3d 139, 147 (4th Cir. 2001) ("*Apprendi* constitutes a procedural rule because it dictates what fact-finding procedure must be employed to ensure a fair trial."). Accordingly, *Teague* precludes *Apprendi's* retroactive application unless an exception applies.

There are two exceptions to *Teague*. The first applies if the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making

43

authority to proscribe." *Id.* at 311. This exception is inapplicable here. The second *Teague* exception concerns "watershed rules of criminal procedure," *id.* at 311, or, put another way, "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *id.* at 313. Such rules are those which are "central to an accurate determination of innocence or guilt," *id.*, and an "absolute prerequisite to fundamental fairness." *Id.* at 314. This second exception applies only to those procedural rules that "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Sawyer v. Smith*, 497 U.S. 227, 242 (1990).

Every Circuit that has addressed the issue has determined that the second *Teague* exception does not apply to *Apprendi*. *See, e.g., United States v. Moss*, 252 F.3d 993, 997-1001 (8th Cir. 2001); *McCoy v. United States*, 266 F.3d 1245, 1256-58 (11th Cir. 2001); *Sanders*, 247 F.3d at 150-51; *Jones v. Smith*, 231 F.3d 1227, 1238 (9th Cir. 2000). Though the matter is certainly debatable, this Court agrees with those decisions. The rationale is best explained in *Sanders*. First, the Supreme Court has made it clear that the exception is exceedingly narrow, and is "'meant to apply only to a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty.'" *Sanders*, 247 F.3d at 148 (quoting *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997). A rule which "merely shifts the fact-finding duties from an impartial judge to a jury clearly does not fall within the scope of the second *Teague* exception." *Id.* (citing *Neder v. United States*, 527 U.S. 1 (1999)). And errors involving failure to submit an element of an offense to a jury have been held to be subject to harmless error review, *Neder*, 527 U.S. at 15, suggesting that the matter is not one that is an "absolute prerequisite to fundamental fairness," as *Teague* requires. *Sanders*, 247 F.3d at 149.

The fact that *Apprendi* wrought a change in the applicable burden of proof likewise does not bring the case within the second *Teague* exception. As the court explained in *Sanders,* an *Apprendi* error does not involve a failure to submit an entire case under an erroneous burden of proof – a constitutional error that some courts have recognized is subject to the second *Teague* exception – but rather the submission of a single element, which the Court for all practical purposes held in *Neder* was subject to harmless-error analysis. *Sanders,* 247 F.3d at 149. For these and the other reasons set forth in *Sanders,* the Court holds that *Teague v. Lane* precludes Hampton from raising his *Apprendi* challenge in this proceeding.

## Conclusion

Blair Leibach is substituted as respondent for Donald Snyder pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases. The Court grants Hampton's petition for a writ of habeas corpus. Respondent is directed to release Hampton from custody unless, within 30 days from the date of this order, the State of Illinois announces its intention to retry Hampton.

MATTHEW F. KENNELLY
United States District Judge

Date: November 29, 2001

45